IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

PETER HARRIS AND           §
LONI HARRIS,               §
                           §
    *Plaintiffs*,          §
                           §
VS.                        §   CIVIL ACTION NO. 1:24-CV-00313
                           §   JUDGE MICHAEL J. TRUNCALE
UPWINTRADE.COM, *et al*,    §
                           §
    *Defendants*.          §
                           §

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY RESTRAINING ORDER

Before the Court is Plaintiffs' Motion for Preliminary Restraining Order (the "Motion"). [Dkt. 10]. On August 8, 2024, the Court granted Plaintiffs' request for a 14-day TRO freezing accounts at four cryptocurrency exchanges to which Plaintiffs allege they have traced their stolen assets. [Dkt. 7.] The Court subsequently extended that TRO for another 14 days. [Dkt. 9.] Plaintiffs now seek to extend this asset freeze through trial.

The Court has reviewed Plaintiffs' Motion and evidentiary materials. For the reasons set out below, Plaintiffs' Motion is hereby **GRANTED**.

### I.    Background

Plaintiffs' relevant allegations are as follows. In February 2024, Plaintiff Loni Harris saw a Facebook post that appeared to be authored by a friend of hers from high school. ECF 10-1, Declaration of Loni Harris (hereafter "L. Harris Decl."), at ¶ 3. This post alluded to the friend's recent

investment successes, which had purportedly been achieved under the guidance of a person named "David." *Id*. Interested, Ms. Harris sent a message to the account that appeared to be operated by her old friend. *Id*. at ¶ 4. This person recommended that Ms. Harris contact David Shamlian, who had purportedly been instrumental in the friend's financial success. *Id*.

Ms. Harris alleges that she later confirmed with her "real" high-school friend that unknown persons had taken over his account before the cryptocurrency-trading success post was ever made. *Id*. at ¶ 5. But, initially unaware of this fact Ms. Harris and her husband Peter Harris reached out to Shamlian on Skype. ECF 10-2, Declaration of Peter Harris (hereafter, "P. Harris Decl."), at ¶ 5. Shamlian offered the Harrises his guidance in cryptocurrency-related investment and trading. *Id*. Shamlian told the Harrises that in order to take advantage of his proprietary trading strategies, they would need to make an account on a cryptocurrency-trading platform called Upwintrade. *Id*. The Harrises soon did so. *Id*.

Over the next several months, Shamlian 'trained' the Harrises in the process of using the Upwintrade platform. *Id*. First, he instructed them to make their own accounts at well-established cryptocurrency exchanges, which they did. *Id*. They then deposited their own U.S. Dollars into those accounts, which they used to buy Bitcoin. *Id*. Then, following Shamlian's instructions, they would transfer their Bitcoin to "deposit addresses" provided to them on the Upwintrade platform. *Id*. They repeated this process in a

series of transactions from February to May 2024, ultimately transferring Bitcoin with transfer-date value of more than $650,000.00 to the addresses provided to them by Upwintrade. *Id*.

Each time the Harrises made a 'deposit' to their Upwintrade account, the account balance presented in their user portal increased as expected. *Id*. at ¶¶ 7 – 8. In fact, just as Shamlian had promised, their balance began to grow rapidly as they appeared to profit from his strategies and Upwintrade's supposedly advanced technology. *Id*. Then, in May 2024, the Harrises decided to withdraw some of their assets from Upwintrade. *Id*. at ¶ 10. But they were told they could not make a withdrawal until they paid more than a million dollars in "commissions" and "taxes" to release their assets. *Id*. at ¶¶ 10 – 11. The Harrises began to suspect that they had been the victims of a scam and retained counsel. *Id*.

The Harrises now allege that Upwintrade's explanations as to why they could not withdraw their funds were lies. ECF 1, Verified Complaint, at ¶ 18. They say the real reason Upwintrade would not return their assets is that Upwintrade is not a real trading platform at all. *Id*. Instead, they allege that they have been the victims of what is known as a "pig-butchering scam." *Id*. at ¶ 4. According to the Harrises, this is a type of investment scam in which the perpetrators deceive victims into depositing their assets on a fake-but-realistic-looking "trading" or "investment" platform, where no trading or

investment ever occurs. *Id*. Instead, the Harrises allege, the assets are simply stolen. *Id*.

After retaining counsel, the Harrises engaged an investigator to perform a "blockchain tracing" report. This "tracing" refers to the process of following digital assets from location to location on the blockchain via publicly available data. ECF 10-4, Declaration of Evan Cole (hereafter "Cole Decl."), ¶¶ 24 – 29. The Harrises' investigator was able to trace their stolen assets to addresses associated with four distinct cryptocurrency exchanges: (1) Binance, (2) Revolut, (3) Remitano, and (4) ByBit. *Id*.

Immediately after filing this action, the Harrises sought an emergency *ex parte* temporary restraining order ("TRO") requiring that these exchanges temporarily freeze the accounts associated with the blockchain addresses they identified as receiving the assets stolen from them, so that they might preserve some assets for recovery. The Court issued a TRO to that effect, and subsequently extended that TRO by 14 days.

The Harrises now seek a preliminary injunction that would extend this asset freezing order through trial. They have submitted five declarations in support of their Motion. Their own declarations set out the allegations recounted above. In addition, the Harrises submit a declaration under the signature of Delaina Snyder, another alleged victim of the Upwintrade scam. Ms. Snyder avers that she, her husband, and a friend of theirs lost more than $200,000.00 to the Defendants. ECF 10-3, Declaration of Delaina Snyder

(hereafter, "Snyder Decl."), ¶¶ 6, 8. Ms. Snyder's declaration recounts experiences that are remarkably similar to the Harrises'. *Id.* at ¶¶ 3 – 11. Together, these three declarations attach hundreds of pages of evidence showing each stage of the scam from the alleged victims' perspectives—from the initial contact through hacked Facebook accounts, to trust-building conversations on Skype, to fake trades and false profits on the Upwintrade platform, to the scammers' demands that they pay millions in "commissions" and "taxes" to "release" their funds.

The Harrises' Motion also attaches the Cole Declaration. Mr. Cole is the founder of Digital Investigations, LLC, a blockchain-investigations firm. Cole Decl., ¶¶ 2 – 3. His declaration submits a preprint of a forthcoming academic article that he describes as the most comprehensive study of pig-butchering scams to date.[1] This study compiled and analyzed information about more than 1,300 pig-butchering scams, with the aim of creating a framework for identifying such scams and setting them apart from other forms of cybercrime (and, presumably, from legitimate investment operations). *Id.* Mr. Cole's declaration provides a detailed comparison of the evidence submitted by the Harrises and Ms. Snyder with the typology set out in *Examining Pig Butchering*. *Id.* at ¶¶ 8 – 17.

---

[1] *Id.* at ¶¶ 5 – 6 (citing Marie-Helen Maras, Emily R. Ives, *Deconstructing a Form of Hybrid Investment Fraud: Examining 'Pig Butchering' in the United States*, JOURNAL OF ECONOMIC CRIMINOLOGY, Volume 5 (forthcoming Sep. 2024) (hereafter, "*Examining Pig Butchering*")).

The Cole Declaration also discusses the scope of the pig-butchering epidemic, the devastation this kind of fraud has wrought on victims, and the organizational and money-laundering practices of the pig-butchering scammers. *Id*. at ¶¶ 18 – 23. Finally, it attaches updated blockchain-tracing evidence purporting to show that the Defendants transferred the Harrises' *and* the Snyders' assets through many of the same intermediary addresses and ultimately to the same accounts at the cryptocurrency exchanges Bybit, Binance, Revolut, and Remitano. *Id*. at ¶¶ 24 – 30.

## II.    Analysis

The Harrises have met the requirements for issuance of a Preliminary Injunction for the following reasons.

First, the Harrises have shown that the Defendants had notice of their Motion and this hearing as required under Federal Rule of Civil Procedure 65(a)(1). Their counsel has submitted a declaration recounting the methods used to provide notice and attaching evidence of the same. ECF 10-5, Declaration of Marshal Hoda (hereafter, "Hoda Decl."), ¶¶ 3 – 4.

Next, the Harrises have met the substantive requisites for issuance of a preliminary injunction. To obtain a preliminary injunction, the movant must show (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction does not issue, (3) that the threatened injury outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction is in the public interest. *Moore*

*v. Brown*, 868 F.3d 398, 402-03 (5th Cir. 2017). Each of these requisites is addressed in turn below.

The Harrises make claims against the Defendants for violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), fraud, and conversion. Complaint, ¶¶ 21 – 32. They have alleged and provided evidence that the Defendants deceived them and misappropriated their assets in what appears to have been an intentional pig-butchering scam.[2] The Court finds that the similarities between Plaintiffs' allegations and the widely known characteristics of this distinctive kind of scam suggest that they will indeed be able to prevail on these claims against the Defendants once a full evidentiary record is developed. The Snyder Declaration and the comparison of the Harrises' evidence to the *Examining Pig Butchering* typology have only strengthened the evidentiary basis for this conclusion since the Court entered the TRO.

In addition, as in the previous order granting the extant TRO, the Court notes that asset freeze the Harrises seek in this instance is permissible in light of their request for a constructive trust over specific, traceable stolen assets, as several courts have held in analogous cryptocurrency-fraud cases. *See, e.g.*, *Yogaratnam v. Dubois*, No. CV 24-393, 2024 WL 758387, at *3 (E.D. La. Feb. 23, 2024) (issuing asset-freeze TRO in crypto-fraud case, noting

---

[2] Complaint, ¶¶ 1 – 4, 14 – 19; L. Harris Decl., *passim*; P. Harris Decl., *passim*; Snyder Decl., *passim*; Cole Decl., ¶¶ 5 – 17 (comparing evidence submitted with leading academic study of pig-butchering scams).

that "numerous district courts … have issued a TRO in this exact circumstance to freeze a cryptocurrency asset," and collecting cases); *Jacobo*, 2022 WL 2052637, at *3 (issuing asset-freezing TRO where plaintiff sought constructive trust over allegedly stolen assets); *Gaponyuk*, 2023 WL 4670043, at *2 (same). The Harrises' claim that their assets can be traced to the Receiving Exchanges is again supported by the blockchain analysis submitted in support of their Motion. Cole Decl., ¶¶ 24 – 30.

The Harrises have also shown that irreparable harm will ensue absent the restraining order they seek. The Cole Declaration details how the assets allegedly stolen from the Harrises could be further transferred to unretrievable locations at any time, with the click of a button. Cole Declaration, ¶ 30 (explaining that "crypto assets can be moved in seconds from address to address," and that the Harrises will be unlikely to recover if they are further dissipated). Several federal courts have found that this exigency justified issuance of freezing orders in similar crypto-fraud cases, and this Court finds their reasoning persuasive here.[3]

---

[3] *See, e.g.*, *Ohlin v. Defendant 1*, No. 3:23-C-8856-TKW-HTC, 2023 WL 3676797, at *3 (N.D. Fla. May 26, 2023) ("Considering the speed with which cryptocurrency transactions are made as well as the anonymous nature of those transactions, it is imperative to freeze the Destination Addresses to maintain the status quo to avoid dissipation of the money illegally taken from Plaintiffs."); *Jacobo v. Doe*, No. 1:22-CV-00672DADBAKBAM, 2022 WL 2052637, at *3 (E.D. Cal. June 7, 2022) ("Because it would be a simple matter for [defendant] to transfer [the] cryptocurrency to unidentified recipients outside the traditional banking system and effectively place the assets at issue in this matter beyond the reach of the court, the court finds that plaintiff is likely to suffer immediate and irreparable harm in the absence of injunctive

Next, the Court finds that the threatened injury to the Harrises outweighs any harm the Defendants may suffer by virtue of a freeze of their accounts. The Defendants will suffer at worst a temporary inability to move assets if the injunction is later dissolved. *See, e.g.*, *Licht v. Ling*, No. 3:23-CV-1018, 2023 WL 4504585, at *3 (N.D. Tex. June 20, 2023) (balancing factor weighed in plaintiff's favor because alleged crypto-thieves faced only "inconvenience" of asset-freeze, which could be undone); *Jacobo*, 2022 WL 2052637, at *6 (same, finding "[a] delay in defendant's ability to transfer the [allegedly stolen] assets only minimally prejudices defendant, whereas withholding injunctive relief would severely prejudice plaintiff by providing defendant time to transfer the allegedly purloined assets into other accounts beyond the reach of this court"). In contrast, maintaining the assets at the destination accounts is perhaps the Harrises' only realistic chance at a future recovery in this case.

Finally, the Court finds that issuing the injunction is in the public interest. In fact, in this case, the public interest weighs particularly heavily in favor of the requested injunction. The Harrises' evidence shows that the devastation wrought by the pig-butchering epidemic is breathtaking. Cole Decl., ¶¶ 21 – 23. The FBI estimates that in 2023 *alone*, pig-butchering scammers stole nearly $4 billion from *tens of thousands* of American victims.

---

relief.") (cleaned up); *Astrove v. Doe,* No. 1:22-CV-80614-RAR, 2022 WL 2805315, at *3 (S.D. Fla. Apr. 22, 2022) (same).

*Id*. CNN has noted that this is "theft at a scale so large that investigators are now calling it a mass transfer of wealth from middle-class Americans to criminal gangs." *Id*. Experienced prosecutors have reported that they "have never seen the absolute decimation of people that [they have] seen as a result of pig butchering." *Id*. The public interest overwhelmingly favors preserving victims' only potential source of recovery through the issuance of preliminary injunctive relief. As other courts have noted, issuing the relief requested will "provide[] assurance to the public that courts will take action to promote … recovery of stolen assets when they can be readily located and traced to specific locations." *Jacobo*, 2022 WL 2052637, at *6. Foreign criminal gangs cannot be allowed to steal the life savings from tens of thousands of hardworking Americans with impunity.

### III.    Preliminary Injunction

Plaintiffs have submitted evidence tracing the assets they allege were stolen from them to 29 deposit addresses at the cryptocurrency exchanges Binance, Revolut, Remitano, and ByBit (the "Receiving Addresses"). The Receiving Addresses are:

| Exchange | Address |
|---|---|
| Binance | 13mLDAfVfyzD8Vf6x9YZ5pALc3g8TXqPix |
| Binance | 1MUxDUmHAVskKATJDCWgk8SJ9ZBHreZAbh |
| Binance | 1DMhMwn4apg49oVjRpbaZqJDDLJaN6iqox |

| Binance | 13WWx7qQ1QBoY2E3sjaRrzvWzg2JJkDAgg |
|---|---|
| Binance | 1PvjGd7aCpvRzZtz4kL9YgdvnYPdpm16oj |
| Revolut | bc1q7gku9m33re89mes97dwq4lawwxg3hj6g28umcy |
| Remitano | 38ZWvd5Be2PqMu5xcvy9PY3T4frKvniNyf |
| Remitano | 38Ep5mFzh6oNbuFXSL1Hvk3g1TwXUMX8xv |
| Remitano | 3M5RWiGdcEDRseLUqaG15HgPLL7bf3644A |
| Remitano | 3A34Ggh1EUNXe4K8ayTLNLdKYAUDTnEU63 |
| Remitano | 3MoVdQzjhYJrz9umg4v1oBRRz5pe9kZVcu |
| Remitano | 3A3NqjhLiexUzcfgGuVo19uzux8rnbqSVE |
| Remitano | 3CaPngqFGiu8kSLEcp9uM5JvK97RdAGHBU |
| Remitano | 3KE6diBJr2yCcd9HEUxH5KNd86s2tzPW2N |
| Remitano | 3B9GDHG6WgrWeavz247zAvbd5WrC8rYF7y |
| Remitano | 3KKGPBqG2GW5PNVmktjoJwsSoGmfrvVTBB |
| Remitano | 3G1gfTQn81jgaPUCWCoSr8j17AtiWn17uy |
| Remitano | 3DGPG9Lh6iLSkxYf9UZxzxjcUKo36xUva9 |
| Remitano | 3D8JCs231iJxK8Jx86pJ4TAWrAAtbRxRPW |

| Remitano | 33heGnSTbA6U7WrfMBYoWYgCRBek2MrKTA |
|----------|------------------------------------|
| Remitano | 3AymDrgNq3WQZaNLh4vxLe8bxVzGaHqQhz |
| Remitano | 31jJbyCxErbbfkuGP1dtz2Pz9jt9SWNv83 |
| Remitano | 35wtpq7h7AjMP2xaS9yNa8T9cgJfUUm5RW |
| Remitano | 3BjbZnAwmmxvQFnibcyGRd8SAwM6xTLYpA |
| Remitano | 3CZ6NHrctR8ceWwyYyJQXP96PMAqEs5J4a |
| Remitano | 3KSpJdiRmej8XkqCYswa58pff127b7nQxc |
| Remitano | 39TPPnjRGB8ANVbs1K7RFoBBDNtvXWtECj |
| ByBit | 1HyTkypyP8yoRGSRrvr74SyEhhX1bkLMiQ |
| ByBit | 14rxMsRQV5fkTDb3ShorD91xQvdwp34hjb |

For the reasons set out in the Motion, the Court finds that the accounts associated with these deposit addresses should be frozen. Accordingly, The Court hereby **ORDERS** that Defendants and their agents, servants, employees, attorneys, partners, successors, assigns, and all other persons or entities through which they act or who act in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any trust, corporation, subsidiary, division or other device, or any of them, are hereby restrained from withdrawing, transferring, or encumbering any assets currently held by,

- 12 -

for, or on behalf of the persons controlling the accounts associated with the above-listed Receiving Addresses, or any business entity through which they act or which acts in active concert or participation with them; including but not limited to those assets currently held at or for the Receiving Addresses.

The Court **ORDERS** the Harrises to cause a copy of this Order to be served on the above-listed entities in a manner compliant with Rule 4 or as the Court may further direct. Upon receiving a copy of this Order, these entities shall be restrained and enjoined from disturbing assets, directly or indirectly, to or on behalf of Defendants or any entities under Defendants' control. Additionally, the Court **ORDERS** that all movement, alteration, or destruction of books, records, and accounts related to the above-listed blockchain addresses is prohibited. The Court declines to impose a bond.

The preliminary injunction set out in this Order shall continue until trial or further order of the Court.

Dated:  September 3, 2024

Prepared By:

THE HODA LAW FIRM, PLLC

Marshal J. Hoda, Esq.
Tx. Bar No. 2411009
12333 Sowden Road, Suite B
PMB 51811
Houston, TX 77080
o. (832) 848-0036
marshal@thehodalawfirm.com

*Attorney for Plaintiffs*